COSMCO, INC., f.k.a. Central Ohio Sheet Metal Co., Inc., Appellee,

v.

HEAD, INC., Appellant.

[Cite as *COSMCO, Inc. v. Head, Inc.* (1990), 70 Ohio App.3d 544.]

Court of Appeals of Ohio,
Franklin County.

No. 90AP–735.

Decided Dec. 6, 1990.

*Lewis J. DiRosario,* for appellee.

*Vorys, Sater, Seymour & Pease, J. Scott Jamieson* and *Bradley K. Sinnott,* for appellant.

McCORMAC, Judge.

Defendant-appellant, Head, Inc., appeals from the judgment of the Franklin County Court of Common Pleas in favor of plaintiff-appellee, COSMCO, Inc., and raises the following assignment of error:

"The Trial Court erred as a matter of law in concluding that the subcontract and applicable provisions of the prime contract are not enforceable."

Appellant was awarded a contract by the federal government to serve as the general contractor on an $8,000,000 construction project at the federally owned Defense Construction Supply Center ("DCSC") in Columbus, Ohio. COSMCO submitted a proposal to do certain sheet metal work comprising part of the total contract. It appears that COSMCO originally submitted its proposal to an unsuccessful general contract bidder and the record is unclear as to how Head actually engaged COSMCO. Nevertheless, Head did orally request that COSMCO commence work in the early part of 1987. About a month after COSMCO began working on the project, the two parties con-

firmed their oral agreement by the execution of a written subcontract calling for COSMCO to perform specified work at a contracted price of $61,050.

The part of the prime contract that is applicable to this suit involves the construction of new roofs over existing roofs on seven buildings at DCSC. Appellee was responsible for fabricating vents which extended from various points on the old roofs through the new roofs and the capping of unwanted vents in the existing roofs. At issue are two changes in the original plans and specifications. Change number one involved the addition of six new vents to one building, which COSMCO contends added $7,140 to the cost of the project. Change number two included the total elimination of vents in four buildings and necessitated capping the openings in the existing roofs. COSMCO submitted a price of $3,960 to Head for these changes.

Head refused to pay the additional sums demanded by COSMCO, contending that its only obligation in the contract was to submit the additional bills to the government official in charge of the contract. Since the official determined that the sums were not due and owing, Head claimed that it had no liability to COSMCO. COSMCO argues that the terms of the prime contract mandating this procedure are not binding on it and, hence, Head is liable to COSMCO for the additional amounts. As a result of the dispute, COSMCO filed suit in the common pleas court.

The trial court, in adopting the report of its referee, concluded that there was no meeting of the minds as to the alternative dispute mechanism and, therefore, COSMCO's actions were properly commenced against Head. Continuing, the trial court held that Head was liable to COSMCO in the amount of $24,350. That amount consisted of $13,250 outstanding on the original $61,050 contract price, which is undisputed except for a $333 deduction allegedly resulting from the changes, and $11,100 for the aforesaid changes.

Head argues that the trial court erred when it concluded that the subcontract executed by the parties was unenforceable. Head argues that both parties were experienced businessmen who knew or should have known of the contents of the prime contract and that to hold otherwise would violate the right to freely contract.

The subcontract was a standard three-page document which, by its terms, incorporated by reference much of the voluminous prime contract. Section 1 of the subcontract provides, in part:

" * * * The SUBCONTRACTOR shall furnish all material and perform all work * * *

" * * * *

"in accordance with the Contract between the OWNER and the CONTRAC-TOR, and in accordance with the General Conditions, Plans, Special Conditions, Drawings, Specifications and Addenda thereto * * *

" * * *

"all of which Contract, General Conditions, Special Conditions, Plans, Drawings, Specifications and Addenda thereto form a part of the Contract between the CONTRACTOR and the OWNER dated January 23, 1987 and further designated and hereby become a part of this SUBCONTRACT. Contract No. DACA27–87–C–0009."

Subsection 5 of the contract states that:

" * * * The SUBCONTRACTOR shall make all claims for extras, for extensions of time and for damage for delays or otherwise, to the CONTRAC-TOR in the manner provided in the General Conditions for like claims by the CONTRACTOR upon the OWNER. The CONTRACTOR shall have no liability to the SUBCONTRACTOR on claims of the SUBCONTRACTOR except to present such claims of the SUBCONTRACTOR to the OWNER and to pay over to the SUBCONTRACTOR any payment received from the OWNER on such claims."

Subsection 58 of the prime contract vests the government contracting officer with the right to make changes in the work, so long as the changes are within the general scope of the contract. Section 43 of the prime contract addresses disputes and expressly provides that the project is subject to the terms of the Contract Disputes Act of 1978, Sections 601–613, Title 41, U.S.Code.

Section 602(a), Title 41, U.S. Code states:

"(a) Executive agency contracts

"Unless otherwise specifically provided herein, this chapter applies to any express or implied contract (including those of the nonappropriated fund activities described in sections 1346 and 1491 of Title 28) entered into by an executive agency for—

"(1) the procurement of property, other than real property in being;

"(2) the procurement of services;

"(3) the procurement of construction, alteration, repair or maintenance of real property; or,

"(4) the disposal of personal property."

The Act goes on to provide that all disputes must first be submitted to the contracting officer. The contracting officer's decision can then be appealed to the Board of Contract Appeals or to the Claims Court. Therefore, if the

contract provisions dealing with disputes are applicable to COSMCO, this court cannot entertain jurisdiction over the matter since the Contract Disputes Act has expressly reserved jurisdiction in another forum.

■ The prime contract at issue involves the " * * * procurement of construction, alteration, repair or maintenance of real property * * *" and expressly includes the provisions of the Act. Therefore, there is no doubt that the prime contract is governed by the Act. The question is whether the subcontract is governed by the Act.

■ The trial court determined that, since the work was commenced under an oral agreement and because of the voluminous nature of the contract, there was no agreement on COSMCO's part to be bound by an alternative dispute mechanism. Both parties testified that commencing work prior to signing a written contract was standard procedure in the construction trade. The written contract was merely meant to confirm and elaborate on the oral understanding. Furthermore, a party to any contract has the duty to read the document before signing it. As this court has stated:

" * * * [T]he duty to read will depend upon the facts of each case 'such as * * * the respective intelligence, experience, age, and mental and physical condition of the parties, and the relation and respective knowledge and means of knowledge of the parties.' * * * " *Mather v. State Farm Mut. Auto. Ins. Co.* (Oct. 4, 1984), Franklin App.No. 83AP–1112, unreported, 1984 WL 5929, quoting *Thomas v. American Workmen* (1941), 197 S.C. 178, 182, 14 S.E.2d 886, 888.

Ralph Mowery, COSMCO's president and owner, testified that he had been in the sheetmetal business for many years and rendered services under government contracts before. In fact, COSMCO had performed similar services at DCSC just two years prior to this job. Mowery had before him the specifications of the project before he submitted his bid and, therefore, had ample opportunity to acquaint himself with the prime contract. Furthermore, COSMCO initially availed itself of the dispute provisions when it submitted its request for an equitable adjustment to the government contracting officer. Only after the request was denied did COSMCO seek redress with the courts. COSMCO cannot now claim ignorance or overreaching as a defense to its failure to read and understand the contract governing the project. Furthermore, even if it could be argued that COSMCO is not bound by the terms of the prime contract, the contract is governed by the federal law, *i.e.*, the Contract Disputes Act, and ignorance of its provisions is no excuse.

■ Another alternative which would excuse COSMCO from the terms of the contract is if the changes were not a part of the prime contract but

actually represented a secondary contract between COSMCO and Head. The evidence does not support such a conclusion. Paul Ondera, vice-president of Head, testified that, before work was commenced on any building, the individual building superintendent, the government contracting officer and representatives of each contractor involved would walk through the building to determine which vents would be needed and which could be eliminated. Marvin Williamson, COSMCO's job supervisor, testified, concerning change order number two, that the plans were not the same as the previous job COSMCO had done at DCSC and, therefore, he asked Head's foreman for clarification. Williamson stated that Head's foreman said he would check with the government representative and get back to Williamson. Eventually, Head's foreman told Williamson that he was right and the vents should be deleted. The evidence shows that the changes were initiated by the government and not by Head. Therefore, the changes were made pursuant to the provisions of the prime contract and did not constitute a separate implied contract between COSMCO and Head.

The trial court concluded that, if Head's position was adopted, COSMCO could be bound by a decision in which it had no input. However, under the Contracts Dispute Act, any action commenced must be brought by the prime contractor *for the benefit of the subcontractor.* This practice, known as sponsorship, predates the Act and is extensively commented on in the legislative history of the Act. See *Eastern, Inc. v. Shelly's of Delaware, Inc.* (N.D.N.J.1989), 721 F.Supp. 649. Sponsorship achieves the aims of the Act by funneling all of the disputes through one party prior to submission to the government, which allows the government to communicate with one party only and facilitates resolutions of disputes between the general contractors and the subcontractors. *Id.* The procedure does not eliminate the opportunity for the subcontractor to have input into the decision.

Since the changes made in the DCSC project were part of the government contract and not a secondary contract, the provisions of Section 601 *et seq.,* Title 41, U.S. Code apply, and COSMCO's remedy in regard to the change orders does not lie in this court. Accordingly, COSMCO is entitled only to the unpaid balance of the original contract, as modified by the contract officer, but not to any additional amounts claimed as a result of the change orders.

Appellant's assignment of error is sustained, and the judgment of the trial court is reversed. The case is remanded to the trial court with instructions to revise its judgment from $24,350 to $12,917.

*Judgment reversed*
*and cause remanded*
*with instructions.*

STRAUSBAUGH and VICTOR, JJ., concur.

WILLIAM H. VICTOR, J., retired, of the Ninth Appellate District, sitting by assignment.